UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| AWP, INC. | CASE NO. 5:24-CV-1995 |
| Plaintiff, | JUDGE BRIDGET MEEHAN BRENNAN |
| v. | |
| INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, DISTRICT LODGE 54/LOCAL LODGE 1297, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Before the Court are cross-motions for summary judgment filed by Plaintiff AWP, Inc. ("AWP") and Defendant District Lodge 54 International Association of Machinists and Aerospace Workers AFL-CIO and Local Lodge 1297 International Association of Machinists and Aerospace Workers AFL-CIO (the "Union"). (Docs. 14, 15.) AWP seeks to vacate an arbitration award, while the Union seeks to confirm the award. Both parties filed oppositions (Docs. 16, 17) and replies (Doc. 18, 19). For the reasons herein, AWP's Motion is DENIED, and the Union's Motion is GRANTED.

I.  BACKGROUND

    A.  Factual Background

AWP "provides traffic control equipment and services to support utility, broadband and infrastructure construction work across the U.S. and Cananda." (Doc. 14 at 144; Doc. 15 at 160.) As relevant here, AWP employs individuals known as "flaggers" who provide vital traffic control services at job worksites, including managing lanes, ensuring safety, and coordinating with construction crews. (Doc. 14 at 144; Doc. 15 at 160.) The Union represents AWP employees, including flaggers. (Doc. 14 at 144; Doc. 15 at 160.) The Union and AWP signed a

collective bargaining agreement effective from December 17, 2022 to October 5, 2025 (the "CBA"). (Doc. 14 at 144; Doc. 15 at 160.) AWP assigns flaggers to jobs as outlined in the CBA. (Doc. 14 at 144; Doc. 15 at 160.) There are two types of jobs a flagger may be assigned to: regular jobs and prevailing wage jobs. (Doc. 14 at 144; Doc. 15 at 160; Doc. 1-1 at 23.) The assignment of prevailing wage jobs is the crux of the dispute here. (Doc. 14 at 144; Doc. 15 at 160; Doc. 1-1 at 23.)

Prevailing wage jobs are highly desirable. (Doc. 14 at 144; Doc. 1-1 at 22-23.) These jobs involve government-funded projects and, pursuant to law, require employees to be paid a "prevailing wage." (Doc. 14 at 144; Doc. 1-1 at 23.) Such wage can be two to three times that of a regular job. (Doc. 14 at 144; Doc. 1-1 at 23.) Because prevailing wage jobs are highly coveted, the CBA covers the assignment of these jobs. Article XIV provides, in relevant part:

> **Section 1.** Employees will be assigned to jobs where Prevailing Wages and Fringes are to be paid on a rotating basis. All employees with a minimum of one year of service or commensurate experience prior to hire, if otherwise qualified, at the time of a Prevailing Wage job will be eligible to participate in the rotation.
>
> **Section 2.** The rotation will begin with the most senior employee and will reset each calendar year. Once assigned to a Prevailing Wage job or jobs, a participating employee will be given a minimum of twenty (20) hours or one (1) week (Sunday to Saturday) of PW work, whichever is greater, before the next eligible party participates.

(Doc. 1-1 at 59.) Accordingly, the CBA mandates AWP rotate prevailing wage jobs.

### B.    Procedural History

On August 3, 2023, the Union filed a grievance pursuant to the CBA. (Doc. 101 at 71.) The grievance protested AWP's alleged failure to properly rotate prevailing wage assignments. (*Id.*) Specifically, the grievance stated:

> Management is not following union contract for prevailing wage jobs Article XIV Sections 1., 2., 3., 4. And [sic] any pertinent articles or sections [i]n the Canton & Cuyahoga Falls Offices with Protectors with 1 or more years of employment. Management does not start with the most senior protector in either office. They are

> putting any protector on the job regardless of time employed. The Protectors are not doing the minimum of 20 hours or a maximum of 1 week's work. Some of the protectors are getting more than 1 week or work.

(Doc. 1-1 at 71.)  Essentially, the Union charged AWP with failing to follow the seniority requirements in the CBA, as well as the rotation provisions in Article XIV.  (Doc. 1-1 at 71; Doc. 14 at 144; Doc. 15 at 161-62.)

The CBA requires AWP and the Union to engage in a four-step grievance process which involves several meetings in an attempt to resolve the dispute.  (Doc. 1-1 at 49-50.)  The parties followed the grievance procedure as outlined in the CBA.  (Doc. 14 at 145; Doc. 15 at 162.)  Specifically, to satisfy step one, on August 14, 2023, the parties met to discuss the matter but were unable to resolve it.  (Doc. 1-1 at 24.)  Then, on August 25, 2023, the parties met to satisfy step two.  (*Id.*)  With the grievance still unsettled, the parties proceeded to step three and held meetings on September 23, 2023 and October 27, 2023.  (*Id.*)  The initial grievance proceedings did not resolve the dispute.  (Doc. 14 at 145; Doc. 15 at 162.)  As a result, and pursuant to the CBA, in December 2023, the Union filed an arbitration demand.  (Doc. 1-1 at 69.)

The matter went to an arbitration hearing on March 15, 2024.  (Doc. 1-1 at 25.)  At the hearing, and pertinent here, AWP argued it was not violating the CBA.  It interpreted the "minimum of twenty (20) hours or one (1) week (Sunday to Saturday) of PW work, whichever is greater, before the next eligible party participates" to mean flaggers are entitled to a minimum amount of work: either 20 hours or one week, whichever is greater.  (Doc. 15 at 167.)  That is, if an employee worked less than 20 hours in a week, the employee could continue the next week at the prevailing wage job because the minimum of 20 hours would be greater than the one week.  (*Id.*)  In contrast, the Union's position was the language meant prevailing wage job assignments had to last a minimum of 20 hours and a maximum of one week.  (Doc. 14 at 152.)  To the Union, after one week in a prevailing wage job, the next flagger in the rotation should be

assigned.  (*Id.*)  AWP argued the Union's position would require one to read "maximum" and other provisions into the CBA which are not there.  (Doc. 15 at 167.)

On June 12, 2024, the arbitrator issued his Arbitration Opinion and Award (the "Award").  (Doc. 1-1 at 21-40.)  After reviewing the dispute, the arbitrator stated:

> At the heart of this case is what the parties intended the wording of Article XIV, Section 2 to mean *at the time it was adopted*.  As a general rule, when interpreting contract language, arbitrators base their decisions on what's termed the "plain meaning" rule, that is, the meaning of contract language should be determined by the plain or usual meaning of words on their face.

(Doc. 1-1 at 30 (emphasis in original).)  The arbitrator then turned to the provision at issue.  (Doc. 1-1 at 31.)

First, the arbitrator found most of the language in Article XIV unambiguous.  (*Id.* ("Under the plain meaning rule, it can be concluded that the intended meaning of Article XIV, Sections 1, 3 and 4 is relatively straightforward.").)  However, the arbitrator found Section 2 "less than clear, and at first glance, can be read to mean two different things."  (*Id.*)  The arbitrator recognized the Union's position—that Section 2 could be read to mean a minimum pay of 20 hours and a maximum length of one week—and AWP's position—that Section 2 could be read to mean only a minimum pay with no cap referenced at all.  (*Id.* at 31-32.)  Accordingly, finding the terms of Section 2 ambiguous, the arbitrator resorted to "which interpretation best reflects what the parties intended," which made it "necessary to consider what the parties understood about PW work at the time this language was being negotiated."  (*Id.* at 32.)  To do so, the arbitrator reviewed past agreements, the parties' course of conduct, and evidence relating to the negotiation of the CBA.  (*Id.* at 32-34.)  The arbitrator also looked to other provisions in the CBA.  (*Id.* at 34.)  In consideration of the above, the arbitrator sided with the Union.  (*Id.* at 34-35.)  On July 20, 2024, the Award went into effect.  (*Id.* at 39.)

Unhappy with the arbitration, on October 18, 2024, AWP filed an Application and

Motion to Vacate Arbitration Award in the Stark County Court of Common Pleas.  (Doc. 1-1 at 5, 72.)  The filing indicates AWP requested the clerk of courts serve the Application and Motion on the Union.  *See AWP, Inc. v. Int'l Assoc. of Machinists & Aerospace Workers, AFL-CIO, District Lodge 54/Local Lodge 1297*, No. 2024-cv-01982 (Stark Cnty. Ct. of Common Pleas Oct. 18, 2024).  On November 14, 2024, the Union timely removed the case to federal court.  (Doc. 1-1 at 1.)  On March 31, 2025, the parties filed cross-motions for summary judgment.  (Docs. 14, 15.)  Both have filed oppositions (Docs. 16, 17) and replies (Docs. 18, 19).

II. ANALYSIS

A. Legal Standard

A court's review of an arbitration award in a labor dispute is "extremely limited."  *Shelter Distrib., Inc. v. Gen. Drivers, Warehousemen & Helpers Loc. Union No. 89*, 674 F.3d 608, 611 (6th Cir. 2012) (citations omitted).  A court's review of an arbitration award is deferential, "especially so when it comes to challenges to the merits of an arbitrator's interpretation of the agreement."  *Mich. Fam. Res., Inc. v. Serv. Emps. Int'l Union Loc. 517M*, 475 F.3d 746, 750-52 (6th Cir. 2007) (en banc).  Unless the arbitrator (1) committed fraud or other dishonesty; (2) resolved a dispute the parties did not submit to him; or (3) did not arguably interpret and apply the collective bargaining agreement, a court will uphold the award.  *See Zeon Chems., L.P. v. United Food & Com. Workers, Loc. 72D*, 949 F.3d 980, 982-83 (6th Cir. 2020) (citing *Mich. Fam. Res., Inc.*, 475 F.3d at 751-52).

B. Jurisdiction

The Court must first consider the Union's jurisdictional argument because without jurisdiction, the Court may not consider the motions to vacate or confirm the arbitration award.  *Sinochem Int'l. Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31, 127 S.Ct. 1184,

167 L.Ed.2d 15 (2007) ("a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction" (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998))); *In re: 2016 Primary Election*, 836 F.3d 584, 587 (6th Cir. 2016) ("courts must decide jurisdictional issues before merits issues").

"Actions filed under § 301 of the [Labor Management Relations Act] are subject to the appropriate state statute of limitations, since it contains no federal limitations provision of its own." *Sterling China Co. v. Glass, Molders, Pottery, Plastics & Allied Workers Loc. No. 24*, 357 F.3d 546, 552 (6th Cir. 2004). "The appropriate statute of limitations utilized in an Ohio case seeking to challenge a party moving to vacate, modify, or correct an arbitration award is the Ohio Revised Code § 2711.13." *Id.* Section 2711.13 provides, in relevant part:

> After an award in an arbitration proceeding is made, any party to the arbitration may file a motion in the court of common pleas for an order vacating, modifying, or correcting the award as prescribed in sections 2711.10 and 2711.11 of the Revised Code.
>
> Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is delivered to the parties in interest, as prescribed by law for service of notice of a motion in an action.

R.C. § 2711.13. Thus, a court lacks jurisdiction unless a party serves a motion to vacate an arbitration award within three months of the arbitration decision. *Galion v. Am. Fed'n of State, Cnty. & Mun. Emp., Ohio Council 8, AFL-CIO, Loc. 2243*, 646 N.E.2d 813, 815 (Ohio 1995); *IBEW Loc. No. 573 v. Steen Elec., Inc.*, 232 F.Supp.2d 797, 804 (N.D. Ohio 2002).

Section 2711.13 states a "notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is delivered to the parties in interest, *as prescribed by law for service of notice of a motion in action*." R.C. 2711.13 (emphasis added). Ohio Rule of Civil Procedure 5 articulates the rules for service of a motion. *See Cox v. Dayton Pub. Sch. Bd. of Educ.*, 64 N.E.3d 977, 981 (Ohio 2016). Under Civ.

R. 5, service can be accomplished in a variety of ways, including: by hand, by mail, or by email. Civ. R. 5(B)(2)(a), (c), (f). If a party chooses to mail service, "service is complete upon mailing." Civ. R. 5(B)(2)(c).

The Union argues AWP failed to serve their motion to vacate on time, and so this Court lacks jurisdiction. (Doc. 14 at 147.) The arbitrator's decision went into effect July 20, 2024. (*Id.* at 148.) AWP timely filed its motion to vacate on October 18, 2024, two days before the prescribed period in § 2711.13. (*Id.*) However, the Union argues AWP did not serve the motion until October 31, 2024. (*Id.*) To the Union, AWP's failure to effectuate service until after the expiration of the statute of limitations precludes this Court's review of the motion to vacate. (*Id.*)

AWP disagrees. AWP explains when it filed its motion to vacate on October 18, 2024, it requested service by the clerk via certified mail. (Doc. 16 at 179.) On October 31, 2024, AWP discovered service had not been effectuated, and so AWP served the Union via an email to the Union's representative. (*Id.*) To AWP, because it followed the steps to effectuate service, service was timely. (*Id.*)

Service was timely and the Court has jurisdiction. AWP filed its complaint in the Stark County Court of Common Pleas on October 18, 2024. The complaint included "instructions for service." The docket reflects service was sent that day with tracking numbers. Follow-up docket entries confirm service was sent on October 18, 2024: two entries state "Service Complete For Service Issued 10-18-2024." Like other methods of service by mail, service is complete on the day the clerk of courts mails the documents, not the day they are received. *See Snyder v. Swick*, No. 2010CA66, 2010 WL 4157269, 2010 Ohio App. LEXIS 4339, *31 (Ohio Ct. App. Oct. 18, 2010) (finding that the docket reflected summons and complaint was mailed by the clerk of

courts and "service was complete on that date"). Accordingly, service was complete on October 18, 2024, and was timely.

It is true that, apparently, by October 31, 2024, the Union had not received the complaint. AWP then served the complaint by email to the Union's representatives that day. The next day, on November 1, 2024, the Union received certified mail with the complaint (though the parties do not make clear if this was from the clerk of courts or AWP itself). But these facts do not change the outcome because the state court docket reflects the complaint was sent on October 18, 2024. That is all that is needed for service. In fact, the Ohio Supreme Court has specifically rejected an actual notice requirement for motions to vacate. *See Cox*, 64 N.E.3d at 982 (rejecting argument that "'notice' as it is used in R.C. 2711.13 is meant to require actual receipt" and instead holding "[s]ervice was complete at the time of mailing").

The Union's reliance on *City of Cuyahoga Falls v. F.O.P.*, No. 23870, 2007 WL 4555511 (Ohio Ct. App. Dec. 28, 2007) is misplaced. There, the plaintiff filed a complaint in state court with a motion to vacate an arbitration award. The docket reflected plaintiff requested service of the petition. But the docket did not reflect any service was made until weeks later, after the expiration of the three-month period. But that is not the case here. Instead, the docket does reflect service was sent on October 18, 2024. And while *F.O.P.* held "an application filed under R.C. 2711.13 ***does not require*** that the clerk of courts issue summons and perfect service," the court did not hold a clerk of courts issuance of the complaint, summons, and motion could not perfect service. In any event, the Ohio Supreme Court's decision in *Cox* is more closely aligned with this case. In *Cox*, plaintiff filed a motion to vacate an arbitration award and requested the clerk of courts serve defendant. Unlike in *F.O.P.*, but similarly here, the docket reflected the clerk of court did so that same day. In interpreting § 2711.13, the Ohio Supreme Court found

this sufficient for service. So too here. As in *Cox*, the state court docket reflects AWP requested service by the clerk of courts. The docket reflects the clerk of courts in fact sent service. That is enough.

Accordingly, the Court addresses the merits of the motions to vacate or confirm the arbitration award.

### C. Arbitration Award

AWP argues (1) the arbitrator resolved a dispute the parties did not submit to him; and (2) the arbitrator did not arguably interpret and apply the bargaining agreement. (Doc. 15 at 165.) Additionally, AWP argues the Award violates public policy and should not enforced. (*Id.* at 170.) Each is considered in turn.

#### 1. Exceeding Arbitration Authority

"Perhaps anticipating that clever parties would attempt to recast a disagreement with an arbitrator's decision as a claim that he acted outside of his authority," the Sixth Circuit "severely curtailed the 'scope of authority' concept." *Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*, 700 F.3d 891, 901 (6th Cir. 2012) (quoting *Truck Drivers Loc. No. 164 v. Allied Waste Sys.*, 512 F.3d 211, 217 (6th Cir. 2008)). As a result, "[a]n arbitrator does not exceed his authority every time he makes an interpretive error; he exceeds that authority only when the [CBA] does not commit the dispute to arbitration." *Id.* (quoting *Mich. Fam. Res.*, 475 F.3d at 756). "[A]n arbitrator's authority is not strictly confined to the 'technical limits of the submission.'" *Id.* (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*, 155 F.3d 767, 772 (6th Cir. 1998)). Thus, "[c]onsidering the strong presumptions in favor of a party's right to arbitration and the extent of an arbitrator's authority, . . . the presumption of authority that attaches to an arbitrator's award applies with equal force to his decision that his

award is within the submission." *Id.* (quoting *Johnston Boiler Co. v. Loc. Lodge No. 893, Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL–CIO*, 753 F.2d 40, 43 (6th Cir. 1985)).

AWP argues the arbitrator exceeded his authority in issuing the Award because certain findings involve issues it believes falls outside of the grievance filed by the Union. (Doc. 15 at 165.) Specifically, AWP takes issue with the Award's discussion of "AWP's process of whitelisting or a factual dispute that AWP had either agreed to or violated any provision of the CBA which stated that AWP had a duty to timely advise the Union about prevailing wage rotations."[1] (*Id.* at 166.) Essentially, AWP argues portions of the Award fall outside of the grievance filed by the Union. (*Id.*)

The Union argues otherwise. To the Union, whitelisting was part of the grievance filed. (Doc. 18 at 201-02.) Further, the arbitrator's Award merely recounted certain issues before it without making distinct findings. (*Id.* at 202.) In this way, the arbitrator did not "decide" issues outside of the grievance. (*Id.*) Lastly, no evidence taken in during the arbitration was outside of the grievance, and even if so, the Award refutes the arbitrator considered this evidence in making a decision." (*Id.*)

The grievance in this case allows the arbitrator to look at "prevailing wage jobs Article XIV Sections 1., 2., 3., 4. And [sic] any pertinent articles or sections" in the CBA agreement. (Doc. 1-1 at 71.) The arbitrator examined AWP's practice of whitelisting as relevant information on whether Defendants violated Article XIV. (*Id.* at 24-25.) The arbitrator did not individually decide on the merits of whitelisting but only evaluated it in the context of Article XIV. (*Id.* at 38

---

[1] "Whitelisting" is a process where contractors identify preferred flaggers for a project. AWP allegedly improperly placed on flaggers on these assignments because of contractor preference regardless of the rotation.

("while [whitelisting] may be good business practice from the standpoint of satisfying customer expectations, and securing PW business, in Article XIV, the Company apparently negotiated away this right.").)  As such, the arbitrator did not address an unpresented dispute but considered other practices merely as context for the grievance.

### 2. Interpretation of the CBA

So long as the arbitrator's award "draws its essence from the collective bargaining agreement" rather than "his own brand of industrial justice," the award is legitimate.  *See Shelter Distrib.*, 674 F.3d at 611.  In other words, "as long as the arbitrator is even arguably construing or applying the contract," the court will uphold the decision.  *See Zeon Chems.*, 949 F.3d at 982-83 (citing *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)).  Only when an interpretation of a contract is "so untethered" to the terms of the agreement that it "casts doubt on whether the arbitrator indeed was engaged in interpretation" may a court declare an award illegitimate.  *See Mich. Fam. Res.*, 475 F.3d at 753.  While this strict standard may allow for "improvident, even silly" arbitrator decisions, "we tolerate these decisions in spite of their errors because [] the parties 'bargained for an arbitrator's interpretation of the contract, not a federal judge's.'"  *Zeon Chems.*, 949 F.3d at 983 (citing *Econ. Linen & Towel Serv., Inc. v. Int'l Bhd. of Teamsters, Teamsters Loc. Union 637*, 917 F.3d 512, 513 (6th Cir. 2019)).  When reviewing an arbitrator's decision, the single question before a court is: did the arbitrator appear to be engaged in interpreting the CBA?  *Mich. Family Res.,* 475 F.3d at 753.  If so, the court stops its inquiry.  *See id.*  If it is unclear, the court will presume the arbitrator is engaged in interpretation.  *See id.* ("it will suffice to enforce the award that the arbitrator appeared to be engaged in interpretation, and if there is doubt, we will presume that the arbitrator was doing just that.").

AWP argues the arbitrator did not engage in the interpretation of the CBA.  (Doc. 15 at 166.)  To AWP, the arbitrator did not try to interpret the CBA and simply provided an award he thought was just.  (*Id.*)  For instance, AWP argues the arbitrator did not interpret the plain meaning of the CBA and relied on the parties' past course of conduct to conclude the Union would never have allowed AWP's conduct based on prior CBAs.  (*Id.*)  Yet, AWP says, the CBA's language is unambiguous.  (*Id.* at 167.)  In this way, the arbitrator should not have resorted to any evidence outside of the CBA to make his decision.  (*Id.*)  To support this conclusion, AWP discusses the CBA, its interpretation of the CBA which AWP believes stems from the language itself, and the only conclusion the arbitrator could have drawn.  (*Id.* at 167-70.)

The Union argues the arbitrator's decision reflects he properly interpreted the CBA and applied it to the facts of this case.  (Doc. 14 at 151.)  The Union points to the arbitrator's decision where he first addressed the CBA provisions at issue.  (*Id.* at 152.)  The arbitrator then applied the plain meaning rule to each provision, finding all but Section 2 unambiguous.  (*Id.*)  Having found Section 2 ambiguous, however, the arbitrator then considered other evidence to determine the parties intended meaning of the language.  (*Id.* at 152-53.)

The Union has the better argument.  The arbitrator began by reciting the principal rule of contract interpretation: "when interpreting contract language, arbitrators base their decisions on what's termed the 'plain meaning' rule, that is, the meaning of contract language should be determined by the plain or usual meaning of the words on their face."  (Doc. 1-1 at 30.)  From there, the arbitrator identified the relevant contractual provisions at issue.  (*Id.* at 31.)  Then, the arbitrator found Sections 1, 3, and 4 were unambiguous, meaning they were "relatively straightforward."  (*Id.*)  But the arbitrator found Section 2 ambiguous.  (*Id.*)  Specifically, the

arbitrator found "the wording in the second half of that sentence is less than clear, and at first glance, can be read to mean two different things." (*Id.*)  He recited the parties' competing interpretations. (*Id.* at 31-32.)  The arbitrator then resorted to other evidence, including the parties' course of conduct and prior contractual dealings, among other things. (*Id.* at 32-34.)  In doing so, the arbitrator found the Union's interpretation of the provision reflected the parties' intent. (*Id.*)  Far from not "arguably construing or applying the contract," the arbitrator "engaged in interpretation" of the CBA.  That is enough to uphold the Award.  *See Browning-Ferris Indus. of Ohio, Inc. v. Int'l Bhd. Of Teamsters, Loc. Union No. 20*, No. 20-4073, 2022 WL 684579, 2022 U.S. App. LEXIS 6157, *14 (6th Cir. Mar. 8, 2022) ("It is well established that a decision need not be vacated if an arbitrator considered extrinsic evidence as part of a good-faith attempt to interpret a contract."); *Int'l Union of Operating Eng'rs, Loc. 18 v. Ohio Contractors Ass'n*, No. 18-cv-722, 2018 WL 6267760, *3 (N.D. Ohio Nov. 30, 2018) ("well-settled rules of contract interpretation allow an arbitrator to consider extrinsic evidence to resolve contract ambiguities" and an arbitrator "may look for guidance from many sources in issuing an opinion and award, so long as the arbitrator still arguably construes the collective bargaining agreement.").

  AWP says the arbitrator gave short shrift to the plain meaning of the language. (Doc. 15 at 168.)  It points to the arbitrator's decision where AWP says the arbitrator overlooked the "grammar" and structure of Section 2. (Doc. 19 at 211-15.)  But that analysis in the arbitrator's decision came after the arbitrator already decided the language was ambiguous.  That is, "grammar" aside, the arbitrator already found Section 2 ambiguous notwithstanding AWP's grammar arguments.  The main thrust of AWP's argument is that the arbitrator got it wrong.  Maybe so.  But the "sole question for [the Court] is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." *Oxford Health*

*Plans LLC v. Sutter*, 569 U.S. 564, 569, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013.) "[A]n arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits." *Id.* (quoting *E. Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000)).

The Court finds arbitrator's Award "draws its essence from the collective bargaining agreement" and should be confirmed.

### 3. Public Policy

"The 'narrow' public policy exception makes an arbitration award unenforceable if it is contrary to an 'explicit,' 'well defined,' and 'dominant' public policy that is 'ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Equitable Res., Inc. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 621 F.3d 538, 551 (6th Cir. 2010) (quoting *E. Associated Coal Corp.*, 531 U.S. at 62-63). "The question is whether the actual arbitration award—the enforcement of the interpretation of the CBA—violates public policy, not whether the breach of the labor agreement or the potential actions that could be taken in response to the award violate public policy." *Id.* (citing *E. Associated Coal Corp.*, 531 U.S. at 62-63). "We 'take the facts as found by the arbitrator' in 'determining whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy." *Id.* (quoting *Int'l Union, UAW v. Dana Corp.*, 278 F.3d 548, 558 (6th Cir. 2002)).

AWP argues the Award violates public policy. (Doc. 15 at 170.) AWP relies on the National Labor Relations Act ("NLRA") which "sets out clear and well-defined statements of public policy for the purpose of overturning an arbitration award." (*Id.*) Section 7 of the NLRA allows employees to bargain collectively. (*Id.*) But, to AWP, the Award requires AWP violate

the CBA.  (*Id.*)  For instance, if a flagger is put on a prevailing work assignment, but that assignment only provides 10 hours of work in a work week,[2] per the Award's interpretation of the CBA, AWP must rotate that employee off at the end of the week.  (*Id.*)  Yet the employee would not have reached a minimum of 20 hours.  (*Id.*)  AWP, then, is left with an impossible choice.  For this reason, the Award violates public policy because it contravenes the employees' rights to collectively bargain.  (*Id.*)

The Union argues AWP is in no such impossible position.  (Doc. 18 at 205.)  Instead, one way around the issue is to pay the employee for the minimum 20 hours regardless of how much time the employee actually worked.  (*Id.*)  That is, the Union says the CBA creates a minimum amount of work hours no matter how much work is actually performed, and a maximum of one week.  (*Id.*)  In this way, AWP would not violate the CBA.  (*Id.*)

The Award does not violate public policy.  The Award itself does not implicate the NLRA, nor its provision that allows employees to collectively bargain.  As argued by the Union, nothing in the Award *requires* AWP to violate the CBA.  Without passing on the merits of paying employees for hours not worked to avoid violating the CBA, the Award does not violate any "explicit," "well defined," and "dominant" public policy.

### III.  CONCLUSION

For the reasons stated above, AWP, Inc.'s Motion for Summary Judgment and Motion to Vacate the Arbitration Award (Doc. 15) is DENIED.  District Lodge 54 International

---

[2] AWP cites instances in which weather might affect an employee's ability to reach what otherwise may have been a scheduled 20 hour or more workweek.  (*Id.*)  For instance, a job that is scheduled for 40 hours in a week might get postponed to the following week due to weather on Wednesday.  The employee would have only worked 16 hours then by the time the workweek ends—less than the "minimum" of 20.  But because the Award requires AWP rotate the employee off at the end of the week, the employee could never reach 20 hours thereby violating the CBA.

Association of Machinists and Aerospace Workers AFL-CIO/Local Lodge 1297 International Association of Machinists and Aerospace Workers AFL-CIO's Motion for Summary Judgment and Motion to Confirm and Enforce the Arbitration Award (Doc. 14) is GRANTED.

    **IT IS SO ORDERED.**

Date: January 16, 2026

                                                            BRIDGET MEEHAN BRENNAN
                                                            UNITED STATES DISTRICT JUDGE